In re BOORSTIN.

(District Court, N. D. Georgia. March 7, 1902.)

No. 778.

BANKRUPTCY—EXEMPTIONS UNDER LAW OF GEORGIA—GOOD FAITH OF BANK-
RUPT.

Under the law of Georgia, which requires a debtor claiming exemptions
from personal property to "act in perfect good faith," and to "make a
full and fair disclosure" of all his property, a bankrupt will not be al-
lowed exemptions from a stock of goods, as against the creditors who
sold him such goods, where he fails, on his examination, to make any
satisfactory showing as to the general conduct of his business, to explain
circumstances which are strongly indicative of fraud or concealment of
property, or to answer questions in relation to his business which any
man of ordinary intelligence should be able to answer.

In Bankruptcy. On review of referee's decision denying the bank-
rupt's claim to exemptions.

The following is the report of the referee, Clifford M. Walker:

B. Boorstin, a merchant of Covington, Ga., was on December 23, 1901,
adjudicated bankrupt on his own petition. He scheduled debts aggregating
$8,151.96. His assets he schedules as a stock of goods worth $2,000, and
open accounts worth $500. The first meeting of creditors was held January
6, 1892, and a trustee elected. The trustee filed his report, setting aside home-
stead exemption in certain articles of merchandise composing a part of his
said stock, selected by the bankrupt, amounting to $1,500. Before the ex-
piration of twenty days after the filing of the trustee's report, certain cred-
itors, whose claims had been filed and allowed, filed exceptions to said report,
alleging that the bankrupt had not acted in perfect good faith, and had not
made a full and fair disclosure of all his personal property, including money,
stocks, and bonds, as required by the laws of Georgia in reference to exemp-
tions. All creditors having been duly notified thereof, the issue so made
came on to be heard before the referee February 7, 1902. A full stenographic
report of the evidence then taken, together with evidence taken heretofore,—
it being agreed to use the same for this hearing,—is of file in the referee's
office. Counsel for bankrupt demurred to the exceptions, insisting that the
allegations therein made were too general and vague, and not specific.
Amendments were proposed and allowed, and the demurrer overruled. What
purports to be bankrupt's ledger, his invoices now shown on the ledger, his
bank-deposit and check-stub books, and the canceled checks were presented
in evidence. In the earnest effort to arrive at the truth in this case, all this
mass of evidence has been gone over minutely, and in the investigation the
referee has spared no time or labor. That such exertion was necessary is
largely due to the failure of bankrupt to keep any cash book, and only a
semblance of a record of his liabilities.

While bankrupt shows payment of large sums of money on account and
for expenses, and says he has acted in good faith, without concealing any
property whatever, there is much damaging evidence against his contention.
Among the very few entries on his ledger bearing any definite information
is one presenting a statement of his condition on January 1, 1900, showing
his stock to be worth $4,500, and his liabilities to be $2,419, or a net worth,
without including bills receivable, of $2,081. Bankrupt testifies that the year
1900 was a remarkably fine business year, and his evidence is corroborated
by the fact that his cash deposits for the last three months average $1,555
per month. Carefully avoiding the dangers of estimating, we can safely con-
clude from this evidence that on January 1, 1901, bankrupt's net worth must
have been as great as on January 1, 1900, or $2,081. His schedules show that
on December 23, 1901, less than 12 months thereafter, his liabilities exceed
his assets $5,551.95. When bankrupt filed his schedules he valued his stock
at $2,000. Fifty days afterwards, when called upon by the creditors to ac-

count for his property, he swears that his stock is worth $3,500. Waiving this strange change of view, giving to the bankrupt the benefit of any possible doubt by allowing the valuation of the stock at $3,500, instead of $2,000, as scheduled, there still remains $6,732.95, and the profits on sales during the year, if any, to be accounted for in expenses, losses in accounts receivable, and depreciation in stock. The bankrupt himself attributes his failure to expenses alone, and the referee is of the opinion that this enormous loss in a business carried on in a small town, with store rent at $27.10 per month, and house rent at $9 per month, even with a family of six children, has not been satisfactorily explained. The only reasonable conclusion to be arrived at is that the bankrupt has concealed from his creditors and the trustee in bankruptcy a considerable portion of his property, and has failed to make a full and fair disclosure thereof. Significantly throwing light on this question of the perfect good faith of the bankrupt are many other circumstances of more or less import. One M. Levin, of the same nationality as bankrupt, boarding with bankrupt, and paying nothing for it, though bankrupt says his contract included board, closely associated with bankrupt before and after the adjudication, present in several private consultations between bankrupt and bankrupt's attorney, was bankrupt's clerk. On May 25, 1901, he swore before the tax receiver of Newton county that $100 in money, $125 in notes and accounts, and $350 in merchandise (furniture) comprised "every species of property that I own in my own right or have control of." The evidence shows that his furniture business was sold out in the summer, and in August Levin entered into clerkship with bankrupt. From this time to December 28, 1901, he deposited in bank $1,401.31 in cash; and bankrupt's schedules a large sum of money due to Levin, besides his claim for services, not one cent of which had Levin collected. Though there is evidence going to show that Levin sold furniture on the installment plan, and collected installments which fell due from time to time, it staggers one's belief that such a business could have been conducted on the basis of a $350 stock. On December 3, 1901, less than three weeks before the filing of bankrupt's petition, but several months after the sale of Levin's stock of furniture, Levin shipped to the city of Atlanta a box which he says contained dry goods consigned to his brother. The explanations of Levin, as well as of his brother, are suspicious, to say the least. Bankrupt schedules no household furniture, and asks no exemption as to such personalty, though on June 20, 1901, he swore before the tax receiver of Newton county that he owned such property, and gave in taxes thereon. He schedules these taxes as a debt due by him, though now he swears that such taxes are due by his wife; and such duplicity is contrary to every principle of good conscience, and does violence to the tenor of the act of the Georgia legislature, already too liberal with a claimant of homestead exemption, which requires that such claimant must present clean hands before any allowance can be made to him. For five days before adjudication, bankrupt made no deposits in bank. Though he attempts to explain that his receipts were applied to creditors' claims, he shows no vouchers for same, and makes absolutely no explanation of the whereabouts of proceeds of sales for several hours after the petition was filed, during which the store was open. Bankrupt suspiciously carried several trunks to Atlanta within three months of his adjudication. He received a sum of money from M. Levin a few days before adjudication, although Levin is scheduled a creditor for a large amount. On November 15, 1901, bankrupt gave a check to J. Turner for $300, which he utterly fails to explain, stating that he does not know how it is. He "does not remember" several material matters tending to show fraudulent acts. There are other suspicious circumstances, but those hereinbefore set out are enough for the purposes of this opinion.

In anticipation of a possible finding that bankrupt had not scheduled all his property, counsel for bankrupt earnestly insisted that in such event intentional fraud must be shown. The Code of Georgia requires that a full and fair disclosure of all property must be made. The supreme court of this state has declared (Torrance v. Boyd, 63 Ga. 23) that "any failure, until satisfactorily explained and accounted for, and the consequences repaired, is to be deemed intentional, and therefore fraudulent." In a long line of deci-

sions, the United States courts have held that, when properly placed on notice, bankrupts must make a satisfactory account of their assets, from which a reasonable conclusion can be arrived at that the bankrupt has acted in perfect good faith. The supreme court of Georgia cites with its approval In re Salkey, 6 Biss. 269, Fed. Cas. No. 12,253 (Ryan v. Kingsbery, 88 Ga. 390, 14 S. E. 605), the facts in which present an analogous case to the case at bar. It also approves the opinion of Judge Drummond, expressed in this language: "The court is not bound to accept his [the bankrupt's] answer that he has told all that he knows about his property, if it clearly appears that there is still property unaccounted for." As to the badges of fraud partly set out in this opinion, the laws of Georgia declare (Code, § 4029) that "fraud may not be presumed, but being in itself subtle, slight circumstances may be sufficient to carry conviction of its existence."

The referee has rarely seen such ability as has been shown in the presentation of the bankrupt's contentions by his counsel in this case. Their earnest efforts and evident honesty of belief in the honesty of their client have elicited the most painstaking investigation of the record on the part of the referee. But it is his opinion, after such an investigation, that the bankrupt has not acted in perfect good faith, and has not made a full and fair disclosure of his property. An order will therefore be entered denying the application for exemption, and it is considered and ordered that the exceptions to the report of the trustee setting aside the exemption be, and the same are hereby, sustained.

Capers Dickson, Foster & Butler, J. M. Pace, and L. L. Middlebrooks, for creditors.

James F. Rogers and E. F. Edwards, for bankrupt.

NEWMAN, District Judge. The above is the report of the referee on the right of the bankrupt to have the exemption allowed by the constitution and laws of Georgia out of his stock of merchandise, which has passed into the hands of his trustee in bankruptcy. The referee, as will be seen, refuses to approve the exemption. In view of the fact that counsel were somewhat restricted in their oral argument before the court on these exceptions, I have examined the evidence in the case, and the entire record, very carefully, and have considered the case, as counsel for the bankrupt urges it should be considered, only with reference to the admitted condition of the bankrupt in June, 1901, and the situation subsequent thereto. That which operates most strongly against the bankrupt, to my mind, is not so much the amount of goods on hand in June, the amount afterwards purchased, and the small amount on hand at the time the petition in bankruptcy was filed, and the failure to account for the proceeds, although this is not at all satisfactory, but it is the failure of the bankrupt to make any satisfactory showing as to the general conduct of his business. His testimony is a succession of failures to answer questions which any business man of ordinary intelligence could answer with reference to the conduct of his own business. He utterly fails to make a full, frank, and complete disclosure as to his affairs, which is required of one seeking an exemption under the laws of Georgia. Section 2830 of the Code of Georgia provides that:

"It shall be the duty of each and every person who claims the benefit of the exemption allowed in this article, as the allowance is a liberal one, to act in perfect good faith; and as it is in the power of the debtor, claiming the exemption of personal property, to conceal part of his property or money, and to claim the balance as exempt, it shall be the duty of such debtor, when he takes steps in the court of ordinary to have said exemption of personal prop-

erty set off to him, to make a full and fair disclosure of all the personal property, including money, stocks and bonds, of which he may be possessed at the time, and all such money or property which he may hold in excess of the said exemption shall be subject," etc.

Another part of the same section is as follows:

"The debtor guilty of wilful fraud in the concealment of part of his property from his creditors, of which he is possessed when he seeks the benefit of the exemption, shall, on account of his fraud, lose the benefit of such exemption, and his property shall be subject to the payment of all just debts which he owed at the time such fraud was committed."

It is impossible to read the examination of this bankrupt, and believe that he has acted "in perfect good faith," as the statute requires, with his creditors.

Questions similar to that presented here have been before this court. In re Waxelbaum, 101 Fed. 228; In re Williamson (in the Northwestern division of this district) 114 Fed. 190, and In re Stephens (in this division) 114 Fed. 192. In the Williamson Case referred to, this language is used:

"In Georgia the exemption from levy and sale provided by statute will not be allowed unless the person claiming the same comes into court with clean hands; and certainly, in order to justify the allowance of an exemption out of a stock of goods, as against the creditors who sold the goods with which the business has been conducted, a case should be shown of fair dealing on the part of the debtor."

I think the conclusions reached by the referee are fully justified by the record in this case. As I was impressed with the argument of counsel for the bankrupt that he had not had opportunity to present the bankrupt's condition prior to June, 1901, I have, as stated, confined my examination of the case to the condition of the bankrupt at that time, and to facts which are developed subsequent thereto, and really mainly as to occurrences at the time and just before the failure of the bankrupt, which seem to me amply sufficient to justify the refusal of the exemption claimed.

It is well understood that the court will not interfere with a finding of the referee on the facts of a case unless it is manifestly erroneous, and certainly this cannot be said of the referee's report in this matter. The action of the referee denying the exemption is approved.